ORIGINAL

35

492830

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel.<br>Denise Hubbard | : | Civil Action No 03-60175 |
| Plaintiffs, | : | FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. §3730(b)(2) |
| v. | : | |
| Ciena Healthcare Management, Inc.<br>4000 Town Center<br>Suite 380<br>Southfield, MI 48075 | : | DO NOT PLACE IN PRESS BOX<br><br>DO NOT ENTER ON PACER |
| and | : | JUDGE MARIANNE O. BATTANI |
| Mohammad Qazi<br>4000 Town Center<br>Suite 380<br>Southfield, MI 48075 | : | MAGISTRATE JUDGE CAPEL |
| and | : | FILED<br>'03 AUG 20 P3:57 |
| Anis Khan<br>4000 Town Center<br>Suite 380<br>Southfield, MI 48075 | : | |
| and | : | |
| Denise Mahnke-Pugh<br>4000 Town Center<br>Suite 380<br>Southfield, MI 48075 | : | |
| Defendants. | | |

-oOo-

**VERIFIED FALSE CLAIMS ACT COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

1. Plaintiff, Denise Hubbard (the "relator") brings this *qui tam* action in the name of the United States of America against Ciena Healthcare Management, Inc. (hereinafter "Ciena"), its owner, Mohammad Qazi (hereinafter "Qazi"), its chief financial officer, Anis Khan (hereinafter "Khan"), and its director of operations, Denise Mahnke-Pugh (hereinafter "Pugh"). This is an action pursuant to the False Claims Act, 31 U.S.C. §3729 et seq. to recover damages and civil penalties for false statements and claims that defendants made or presented to the United States. The violations arise out of defendants' requests for payment by Medicare and Medicaid (hereinafter, the "U.S. Government" or "U.S.") based on false claims for skilled nursing facility and therapy services. The false claims arise out of a) billing for unnecessary or non-covered services, b) submission of false cost reports, c) violation of self-referral prohibitions and anti-kickback laws, and d) quality of care deficiencies, as is more fully set forth below.

2. By falsely billing as set forth in this Complaint, the defendants knowingly caused the U. S. to pay defendants millions of dollars more than it would have had defendants followed the proper billing procedures.

3. Realtor brings this action for violations of the FCA on behalf of herself and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

4. As required by the False Claims Act, 31 U.S.C. § 3730(a)(2), the relator has provided

to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan, simultaneous with the filing of this complaint, a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to plaintiff at her filing establishing the existence of defendants' false claims.

5. The pervasive fraud and false claims described infra occurred at the St. James Nursing Facility, which is located at 15063 Gratiot Ave., Detroit, MI 48205 and owned and operated by defendant Ciena. Through her familiarity with defendants' procedures at this and other locations, plaintiff alleges on information and belief that these same false and fraudulent practices have occurred and continue to occur in the other facilities owned and operated by defendant Ciena.

6. At all times relevant hereto, defendant Ciena acted through its agents and employees and the acts of defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, set or ratified at the highest corporate levels of defendant, including by defendants Qazi, Khan and Pugh.

7. To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent

necessary to avoid the statutory preemption.

8. Furthermore, to the extent that the allegations or transactions set forth herein are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil money penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act, pursuant to 28 U.S.C. §1345, which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America, and pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States.

10. The acts proscribed by 31 U.S.C. §3729 et seq. and complained of herein were performed by the defendants who transact business and/or reside in this District. Therefore, this Court has personal jurisdiction over defendants, and venue is proper in this district, pursuant to 31 U.S.C. §3732(a). Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c), because the defendants are subject to personal jurisdiction in this District and transact business in this District.

## PARTIES

11. Relator **Denise Hubbard** is a resident of the State of Michigan. At all times relevant and material, relator was and is a registered nurse. Relator began working for Ciena on January 8, 2001 and from January 15, 2001 to the third week in March, 2001, served as acting director of nursing for St. James Nursing Facility. Relator is an "original source" of this information within the meaning of 31 U.S.C. §3730(c)(4)(B), but states that to her knowledge the information contained herein concerning defendants' alleged False Claims Act violations has not been publicly disclosed. Prior to filing this action, beginning in 2001 and continuing to the present, relator voluntarily provided the allegations and information upon which this action is based to the United States government in numerous oral and written reports to Melanie Kersey, Mark Emmons and Steve Miller of the Federal Bureau of Investigation (FBI).

12. Defendant Ciena is one of the largest nursing home chains in the state of Michigan. It currently operates approximately 24 homes in the State of Michigan and is attempting a national expansion. Its corporate offices are located at 4000 Towne Center, Suite 380, Southfield, MI 48075.

13. Defendant Qazi is the owner of Ciena; defendant Khan is its chief financial officer and defendant Pugh is its director of operations. Qazi, Khan, and Pugh maintain their offices at 4000 Towne Center, Suite 380, Southfield, MI 48075.

## REGULATORY FRAMEWORK

14. As part of the Omnibus Budget Reconciliation Act of 1987, Congress enacted the

Nursing Home Reform Act, 42 U.S.C. § 1396 et seq., which took effect on October 1, 1990.

15. The Nursing Home Reform Act mandates that nursing facilities such as those operated by defendants, including but not limited to St. James, comply with federal requirements relating to the provision of services. 42 U.S.C. § 1396r(b). Specifically, in terms of the quality of life for residents of nursing facilities, the Act states that **"a Nursing facility must care for its residents in such a manner and in such environment as will promote maintenance or enhancement of the quality of life of each resident."** 42 U.S.C. §1396r(b)(1)(A).

16. The Nursing Home Reform Act further mandates that a nursing facility **"provide services and activities to attain or maintain the highest practical physical, mental and psychological well-being of each resident in accordance with written plan of care which – (A) describes the medical, nursing, and psychological needs of the residents and how such needs will be met;..."** 42 U.S.C. § 1396r(b)(2)(A).

17. The Nursing Home Reform Act imposes a duty upon the nursing facility to fulfill the resident's care plans by providing, or arranging for the provision of, among other things, nursing and related services and medically-related social services that attain or maintain the highest practical physical, mental, and psychological well-being of each resident, as well as pharmaceutical services, therapy services and dietary services to meet the nutritional and special dietary needs of each resident. 42 U.S.C. § 1396r(4)(A)(I-iv).

18. The Medicare Program is a health insurance program for individuals 65 years and older, certain disabled individuals under age 65, and people of any age who have permanent kidney

failure. The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 et seq.).

19. The Medicaid Program is a joint federal-state program funded under Title XIX of the Social Security Act. As a prerequisite to enrollment as a provider in the Medicaid Program, long-term care facilities are required to enter into provider agreements and agree to, among other things, comply with federal and state provider participation requirements as a condition of federal and state funding.

20. To participate in the Medicare and Medicaid programs, nursing homes must be in compliance with the federal requirements for long term care as prescribed in the U.S. Code of Federal Regulations (42 CFR Part 483). Under the regulations, the nursing home must:

A) Have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care (42 CFR § 483.30).

B) Conduct initially (no later than 14 days after admission) and periodically (after a significant change in the resident's physical or mental condition and, in no case, less often than once every 12 months) a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity (42 CFR § 483.20).

C) Develop a comprehensive care plan for each resident that includes measurable

objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment. The care plan must be developed within 7 days after completion of the comprehensive assessment and describe the services that are to be furnished. Also, the care plan must be periodically reviewed and revised by a team of qualified persons after each assessment (42 CFR § 483.20).

D) Prevent the deterioration of a resident's ability to bathe, dress, groom, transfer and ambulate, toilet, eat, and to use speech, language or other functional communication systems (42 CFR § 483.25).

E) Provide, if a resident is unable to carry out activities of daily living, the necessary services to maintain good nutrition, grooming, and personal and oral hygiene (42 CFR § 483.25).

F) Ensure that residents receive proper treatment and assistive devices to maintain vision and hearing abilities (42 CFR § 483.25). Ensure that residents do not develop pressure sores and, if a resident has pressure sores, must provide the necessary treatment and services to promote healing, prevent infection and prevent new sores from developing (42 CFR § 483.25).

G) Provide appropriate treatment and services to incontinent residents to restore as much normal bladder functioning as possible and prevent urinary tract infections and to restore as much normal bladder function as possible (42 CFR

§ 483.25).

H) Ensure that the resident receives adequate supervision and assistive devices to prevent accidents (42 CFR § 483.25).

I) Ensure that a resident maintains acceptable parameters of nutritional status, such as body weight and protein levels (42 CFR § 483.25).

J) Provide each resident with sufficient fluid intake to maintain proper hydration and health (42 CFR § 483.25). Ensure that residents are free of any significant medication errors (42 CFR § 483.25).

K) Care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life (42 CFR § 483.15).

L) Promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect in full recognition of his or her individuality (42 CFR § 483.15).

M) Ensure that the resident has the right to choose activities, schedules, and health care consistent with his or her interests, assessments and plan of care (42 CFR § 483.15).

N) Ensure that the medical care of each resident is supervised by a physician and must provide or arrange for the provision of physician services 24 hours a day, in case of an emergency (42 CFR § 483.40).

O) Provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident (42 CFR §483.60).

P) Be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident (42 CFR § 483.75).

Q) Maintain clinical records on each resident in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible, and systematically organized (42 CFR § 483.75).

21. Medicare pays for Skilled Nursing Facility (SNF) services under a prospective payment system (PPS) that pays a pre-determined per diem rate. Under the PPS, each beneficiary is designated to a resource utilization group (RUG) that contains patients with similar service needs who are expected to require similar amounts of resources. The daily rate for each RUG is calculated using the sum of three components:

a) a fixed amount for routine services such as room, board, linens and administrative services;

b) a variable amount reflecting the intensity of nursing care patients are expected to require; and

c) a variable amount for the expected intensity of therapy services.

22. As a condition of participation in the Medicare program, Defendants completed

Medicare enrollment applications certifying A) adherence to all Medicare laws and guidelines which dictate the proper operation of their businesses; B) adherence to guidelines as outlined by the Federal Government; and C) that there would be no prohibited referrals and no prohibited billings to Medicare.

23. As a condition of participation in the Medicare program and as a condition precedent to the receipt of payment or reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, Defendants completed cost reports that contained certifications by defendants that they were familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in the cost reports were provided in compliance with Medicare laws and regulations.

24. Based on Medicare regulations and laws cited herein, if therapy services are billed to Medicare through the submission of false claim forms and the services were not provided, were provided in amounts of time units less than amount of time units stated on the claim forms, or were not medically necessary, then the billings are false claims to Medicare because they are based on fraudulent activities and billings of defendants.

25. Based on Medicare regulations and laws cited herein, if costs or expenses are billed to Medicare through the submission of false cost reports, and the costs or expenses included on the cost report were not incurred, or were not incurred for the purpose of treating and providing care to Medicare beneficiaries, then the cost reports are false claims to Medicare because they are based on fraudulent activities and billings of Defendants.

26. The self-referral law, as enacted in 1989, prohibited a physician from referring a patient to a clinical laboratory with which he or she (or an immediate family member) has a financial or ownership interest. Effective Jan. 1, 1995, Congress extended the law to prohibit a physician from referring patients to providers of other categories of health care services if the physician (or an immediate family member) has a financial relationship with the service provider. The other categories include: physical therapy services; occupational therapy services; radiology services and supplies; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient hospital services. The law also prohibits an entity from billing for services provided as the result of a prohibited referral.

27. Under the Federal health care anti-kickback law, 42 U.S.C. § 1320a-7b(b), it is a felony knowingly and willfully to offer, solicit, pay, or receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a Federal health care program may make payment.

**SUMMARY OF CARE DEFICIENCIES**

28. Relator has observed and attempted to rectify numerous violations of the above-cited nursing home care requirements, examples of which are set forth in detail below. These violations exemplify the systemic inadequacies of St. James nursing home and the other nursing homes owned and operated by defendant Ciena.

29. In each and every instance, defendants resisted and intentionally thwarted relator's attempts to bring them into compliance, so relator resigned from Ciena's employ and reported the violations to the state and federal government. In retaliation, Ciena and its agents, servants and employees threatened to "see to it" that relator would lose her nursing license.

30. At all times relevant and material, residents at the St. James Nursing home were subject to severe weight loss. One resident, whose initial is "W," was supposed to be being tube fed due to dysphagia. In October 2000 he weighed 135 pounds and at the end of November 2000 he weighed 109 pounds. The nurses notes from October to December did not report any intolerance to tube feeding, nausea, vomiting, diarrhea, abdominal distension, cancer or gastrointestinal disorder that would explain the sudden severe weight loss. A wound assessment record dated 10/31/00 for this patient relating to a bedsore states malnutrition was a contributing factor.

31. Another resident whose first initial is "S" and who was born in 1958, was supposed to be tube fed. She also suffered from severe weight loss, losing 24 pounds from December 2000 to January 2001. Her records document that she was not fed at all on December 29, 2000.

32. On January 14, 2000 Relator was called into the St. James facility because the day nurses had not shown up. She went into this patient's room and observed that the patient was having extreme difficulty breathing because her trach tube was completely plugged with hard, dried, green mucous. Relator and another nurse, Laurie Moody, had to remove the tube and replace it. They had difficulty because they could not find the needed supplies in the building. They did successfully replace the trach and oxygenated the patient. She had symptoms of dehydration,

tenting skin, cracked lips, dry tongue. The patient was sent to the hospital and returned to the facility at a later date and died shortly thereafter. She weighed only 68 pounds and her bones were protruding through her skin. The patient's medical records are replete with indications of inadequate care.

33. At all times relevant and material, residents had serious problems with pressure ulcers due to inadequate care, and defendants did not maintain accurate records pertaining to these ulcers.

34. At all times relevant and material, defendants failed to perform tuberculosis testing for residents or undertake infection control measures.

35. Relator observed that the residents at the facility were not being given their medication. She found over 50 errors pertaining to administration of medication in the medical records involving 34 areas of concern, including improper counting of narcotics, lack of medications being passed resulting in high and low drug levels on many medications such as Dilantin and Coumadin, lack of pain assessment documentation in charts, lack of records recording refrigerator temperature, and others. The problem was so egregious relator had to call in a team, Specialized Pharmacy Services, Inc. to address the issues. Previously, staff failed to show up for scheduled training, as documented by Specialized Pharmacy Staff.

36. Residents of the facility were not fed, (even those dependent on tube feeding), and inservice training to the staff to correct this was faked. Defendants placed the facility administrator and the relator under extreme pressure to keep staffing down and required them to submit daily staffing sheets to Ciena's corporate headquarters. Defendants also cut back on food portions and

laundry department hours, and terminated security personnel, all in violation of the regulations set forth above.

37. To minimize costs at the expense of quality of care, defendants instructed staff to hire staff whom relator believed did not speak English well enough to communicate with patients and who had insufficient training or experience. For example, defendants instructed relator and the administrator at St. James to hire one individual, whose only job experience as listed on his resume, was as a metal technician and machine operator, as a Rehabilitation Technician for $7.00 per hour.

**FALSE BILLINGS**

38. Defendant Qazi owned, and defendant Ciena directed, a therapy business known as Sunshine Therapy through which defendants knowingly submitted false claims to Medicare Part B for services that were not rendered, services that were not medically necessary, services that were duplicated by physical and occupational therapy, and services that were not likely to render reasonable progress to be made towards normal goals in therapy. In addition, defendants' referrals to Sunshine Therapy violated the self-referral and anti-kickback laws and therefore constituted false claims.

39. Defendants, under the name Sunshine Therapy, submitted claims to Medicare for ostensible group therapy that did not comply with Medicare requirements, in that there were too many people in a group to qualify for Medicare reimbursement, the services were not rendered as claimed, and/or for which the documentation was faked.

40. One example of defendants' seeking reimbursement for improper therapy is the case of

a patient whose first initial was "A." He was a bilateral amputee whom defendants referred for physical therapy consisting of exercises to the left lower extremity even though he did not have a left lower extremity. Relator confronted Ciena's agents and employees, in particular the defendant Pugh and the former director of Sunshine Therapy whose first name was Amarit, about this issue and similar ones on numerous occasions but they defended Ciena's practices.

41. Defendants instructed unqualified persons to provide therapy services. For example, defendants instructed certified occupational therapy assistants or physical therapy assistants perform Medicare Part A physical therapy evaluations even though the regulations require these evaluations to be done by a registered therapist. Defendants would instruct registered therapists to sign evaluations performed by unqualified employees as though they had completed the evaluations themselves. Defendants would also instruct registered therapists to copy an evaluation done by someone else and sign it without actually doing the evaluation him or her self.

42. During the course of her employment at St. James, relator on numerous occasions encountered difficulty purchasing food, services and supplies for the nursing home because vendors stated they had not been paid for extended periods. One vendor of x-ray services told relator in 2001 that his bill to Ciena for services at St. James had not been paid in over a year and a half. Vendors routinely called the administrator asking for their overdue bills to be paid.

43. Notwithstanding the fact that Ciena had not paid many vendors' bills, defendants nevertheless included the amounts of these bills on its cost reports, misleading the U. S. Government to believe that Ciena had incurred more expense than it actually had, and was therefore

entitled to higher reimbursement.

44. Relator informed the FBI in the spring of 2001 that numerous vendors were not being paid and that some were being asked to change the dates on their invoices. She also told the FBI at that time that a Medicare Part A vendor of x-ray services had not been paid in over a year and therefore that expense could not legitimately be in the cost report.

45. On February 7, 2002, Ciena's accountant stated that defendants were "ripping off Medicare with the therapy company" (Sunshine Therapy) and that defendant Kahn frequently called him and told him to change figures on cost reports. Relator immediately provided this information to the FBI as well.

46. Relator developed a documentation system while employed by Ciena that was intended to be implemented at St. James and other Ciena facilities to improve resident care and nursing documentation. While developing the system, relator pointed out to the head of therapy, Amarit, that defendants were assessing residents who had diagnoses such as dehydration, urinary tract infection or debility (who did not require high levels of therapy) at high levels of therapy. Relator also pointed out that they were using old diagnoses as the primary diagnosis even though it was unrelated to the most recent qualifying hospital stay or the primary diagnosis from the hospital. Relator told Amarit that if the Fiscal Intermediary audited the charts the therapy would be found unjustified and the claims would be rejected. Amarit said relator's documentation system would justify the therapy to the government. Relator also questioned defendants' submission of improper HCFA 700 and 701 forms. When relator was pointing out deficiencies and questionable therapy

practices that were causing fraudulent billing, defendants told her to maximize Medicare reimbursement and promised her career advancement and higher wages if she disregarded defendants' fraudulent manipulation of the RUG rates using inappropriate therapy assessments. Relator created and provided to the FBI, together with copies of her documentation system, example charts of the effects of MDS upcoding that show revenues defendants were able to gain by fraudulently misrepresenting minutes of therapy, Activity of Daily Living (ADL) scores and by altering depression indicators.

47. Defendant Pugh instructed staff at Ciena, including relator at St. James, to back date and upcode the Minimum Data Set (MDS). Pugh knew upcoding the MDS would cause the Medicaid daily rate and the Medicare Part A rate to be falsely inflated because she had attended seminars in 2000 where she was instructed on the Medicare certification and MDS processes. Defendant Pugh often bragged to co-workers that her six-figure salary was a result of her ability to "maximize reimbursement" and "improve cash flow."

48. The Ciena compliance report done by nurse consultant Mary Bold RN dated January 4 and 5, 2001 documents that proper Medicare Part A certifications and re-certifications for skilled services "are still not done." When relator began work for Ciena on January 8, 2001 she observed that the staff at St. James did not bother to do the certifications even though the law requires them. Sometimes staff would fill them out in advance. In one such instance, Dr. Bruce Johnson had competed a Part A certification so far in advance that when his services were terminated the certification was already signed for the next month. When relator told defendant Pugh about the

certification, Ms. Pugh instructed relator to shred it. Destruction of an active medical record is prohibited by law so relator did not shred the document, but rather, placed it back in the chart and provided a copy of the certification to the FBI and the Michigan State Attorney General's office. During the entire time relator worked at St. James, she and other staff were instructed on numerous occasions by defendant Pugh fraudulently to back date and complete well over 60 Part A certifications. Ms. Moody stated she was instructed to do the same, and relator turned in to the FBI a statement to this effect by Ms. Moody.

49. Defendant Qazi insisted on free medical directorship services. These medical directors, who served for free, saw and billed patients at the same facility at which they were medical director, and these patients were referred to them by Ciena facilities, in violation of the self-referral and anti-kickback laws.

50. Defendant Khan instructed relator and the facility administrator to buy gloves at higher prices than other vendors from a Mr. Nassir Khan, (who is believed to be a close family member of defendant Khan), in violation of the self-referral prohibitions set forth above.

51. Defendants, and each of them, knowingly and intentionally planned and initiated the above-described fraud for purposes of obtaining and/or inflating payments from the U.S. that the U.S., but for the false statements, would not have paid. This fraudulent maximization of federal reimbursement resulted in higher income, salary, bonuses and other payments to defendants, and each of them.

**COUNT I**
**FALSE CLAIMS ACT, 31 U.S.C. § 3729**

52. The relator realleges and incorporates by reference the above paragraphs as though fully set forth herein.

53. Defendants have knowingly submitted, or caused to be submitted, false certifications regarding their compliance with State and Federal law and regulations in order to improperly obtain continued Medicare and Medicaid funding.

54. Defendants' submission of claims for payment to the federally-funded Medicare and Medicaid programs for Ciena's nursing homes, including but not limited to St. James, from at least January to March 2001, but upon information and belief, from Ciena's inception to the present, violated the False Claims Act, in that the claims a) contained knowingly false representations of compliance with all conditions for payment guaranteed under the Nursing Home Reform Act, b) knowingly billed for unnecessary, non-covered, or not-provided services, c) included expenses on the cost reports that had not been paid, and d) violated self-referral prohibitions and anti-kickback laws.

55. Defendants have submitted or caused to be submitted false claims for services rendered to the residents of St. James and other nursing facilities knowingly, in deliberate ignorance of, and/or in reckless disregard of the truth of those claims in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

56. Defendants have submitted or caused to be submitted false cost reports for St. James and other nursing facilities, knowingly, in deliberate ignorance of, and/or in reckless disregard of the truth of those claims in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

57. As direct and proximate cause of Defendants' fraudulent conduct, the United States has suffered, and continues to suffer, harm.

**WHEREFORE**, relator respectfully requests this Court to enter judgment against defendants, and each of them, jointly and severally, as follows:

(a) That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 et seq. provides;

(b) That civil penalties in the maximum amount allowed by law be imposed for each and every false claim that defendants presented to the U.S. and/or its grantees;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

(e) That the relator be awarded the maximum amount allowed to her pursuant the False Claims Act; and

(f) That this Court award such other and further relief as it deems proper.

**DEMAND FOR JURY TRIAL**

Relator, on behalf of herself and the United States, demands a jury trial on all claims

alleged herein.

Dated: Aug 19, 2003

Denise Hubbard
Relator

Robert D. Ihrie (P26451)
Ihrie O'Brien
24055 Jefferson Avenue
Suite 2000
St. Clair Shores, Michigan 48080
(586) 778-7778

Robin Page West (#1233)
Cohan & West, P.C.
201 N. Charles Street
Suite 2404
Baltimore, Maryland 21201
(410) 332-1400

J. Stephen Simms (#4269)
SimmsShowers, LLP
20 S. Charles Street
Suite 702
Baltimore, Maryland 21201
(410) 783-5795

**Attorneys for Relator**

ORIGINAL 03-60175

JS 44 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**I. (a) PLAINTIFFS**

United States of America ex rel. Denise Hubbard

(b) County of Residence of First Listed

(C) Attorney's (Firm Name, Address, and Telephone Number)

See attachment--Attorneys

**DEFENDANTS** Battani/Capel

See-attachment--Defendants

60175

County of Residence of First Listed Oakland

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known) JUDGE MARIANNE O. BATTANI

MAGISTRATE JUDGE CAPEL

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item 111)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another | 2 | 2 | Incorporated and Principal of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- 110 Insurance
- 120 Marine
- 130 Miller Act
- 140 Negotiable Instrument
- 150 Recovery of Overpayment and Enforcement of Judgment
- 151 Medicare Act
- 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- 153 Recovery of Overpayment of Veteran's Benefits
- 160 Stockholders' Suits
- 190 Other Contract
- 195 Contract Product Liability

**REAL PROPERTY**
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault Libel And Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury

PERSONAL INJURY
- 362 Personal Injury-Med. Malpractice
- 365 Personal Injury - Product Liability
- 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**CIVIL RIGHTS**
- 441 Voting
- 442 Employment
- 443 Housing/ Accommodations
- 444 Welfare
- 440 Other Civil Rights

**PRISONER PETITIONS**
- 510 Motions to Vacate Sentence Habeas Corpus:
- 530 General
- 535 Death Penalty
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition

**FORFEITURE/PENALTY**
- 610 Agriculture
- 620 Other Food & Drug
- 625 Drug Related Seizure of Property 21: 881
- 630 Liquor Laws
- 640 R.R. & Truck
- 650 Airline Regs.
- 660 Occupational Safety/Health
- 690 Other

**LABOR**
- 710 Fair Labor Standards Act
- 720 Labor/Mgmt. Relations
- 730 Labor/Mgmt. Reporting & Disclosure Act
- 740 Railway Labor Act
- 790 Other Labor Litigation
- 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- 422 Appeal 28 USC 158
- 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- 820 Copyrights
- 830 Patent
- 840 Trademark

**SOCIAL SECURITY**
- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

**FEDERAL TAX SUITS**
- 870 Taxes (U.S. Plaintiff or Defendant)
- 871 IRS-Third Party 26 USC 7609

**OTHER STATUTES**
- 400 State Reapportionment
- 410 Antitrust
- 430 Banks and Banking
- 450 Commerce/ICC
- 460 Deportation
- 470 Racketeer Influenced & Corrupt Organizations
- 810 Selective Service
- 850 Securities/Commodities/Exchange
- 875 Customer Challenge 12 USC 3410
- 891 Agricultural Acts
- 892 Economic Stabilization Act
- 893 Environmental Matters
- 894 Energy Allocation Act
- 895 Freedom of Information Act
- 900 Appeal of Fee Determination Under Equal Access to Justice
- 950 Constitutionality of State Statutes
- [X] 890 Other Statutory Actions

U.S. DIST. COURT CLERK EAST DIST. MICH. DETROIT — FILED

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multi district Litigation
- [ ] 7 Appeal to District Judge from Magistrate

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Violation of the False Claims Act, 31 U.S.C. Sections 3729 et seq. (civil)

**VII. REQUESTED IN COMPLAINT:** [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$DEMAND over $75,000

CHECK YES only if demanded in complaint: JURY DEMAND: [X] Yes [ ] No

**VIII. RELATED CASE(S)** (See instructions): IF ANY

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

Robert D Thorne

# PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: ______________________

Case No.: ______________________

Judge: ______________________

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☒ No

If yes, give the following information:

Court: ______________________

Case No.: ______________________

Judge: ______________________

Notes :

## ATTACHMENT TO CVIL COVERSHEET

**Defendants**

Ciena Healthcare Management, Inc.
4000 Town Center
Suite 380
Southfield, MI 48075

Mohammad Qazi
4000 Town Center
Suite 380
Southfield, MI 48075

Anis Khan
4000 Town Center
Suite 380
Southfield, MI 48075

Denise Mahnke-Pugh
4000 Town Center
Suite 380
Southfield, MI 48075

**Attorneys for Plaintiff/ Relator**

Robert D. Ihrie (P26451)
Ihrie O'Brien
24055 Jefferson Avenue
Suite 2000
St. Clair Shores, Michigan 48080
(586) 778-7778

Robin Page West (#1233)
Cohan & West, P.C.
201 N. Charles Street, Suite 2404
Baltimore, Maryland 21201
(410) 332-1400

J. Stephen Simms (#4269)
SimmsShowers, LLP
20 S. Charles Street, Suite 702
Baltimore, Maryland 21201
(410) 783-5795